UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| EASTERN AWNING SYSTEMS, INC., and STEPHEN LUKOS, | : : : | CIVIL ACTION NO. 3:01cv912 (RNC) |
| Plaintiffs, | : : | |
| v. | : : | |
| HAROLD'S CANVAS AND AWNINGS, INC., TOFF INDUSTRIES, INC. and HAROLD TOFFEY, | : : : : | |
| Defendants. | : : | NOVEMBER 1, 2004 |

PLAINTIFFS' MEMORANDUM OF
LAW REGARDING CLAIM CONSTRUCTION

The plaintiffs, Eastern Awning Systems, Inc. ("Eastern"), and Stephen Lukos

("Lukos"), hereby respectfully submit this Memorandum of Law Regarding Claim

Construction of United States Patent Number 5,273,095 (the "'095 Patent").

I.    BACKGROUND

The plaintiff Lukos is the owner of the '095 Patent, which issued on December 28,

1993. See '095 Patent, attached as Exhibit A hereto. The '095 Patent concerns the field of

awnings and awning support systems, and the invention disclosed in the '095 Patent relates to

a bracket assembly for the lateral arm of an awning system that enables the arm to rotate

vertically from its equilibrium position in order to absorb and shed an excessive load on the

awning (from, for example, the pressure of wind or rain) and then return to its equilibrium

position, thus avoiding serious damage to the awning and/or the attached structure. See,

e.g., Ex. A, at col. 1, ll. 13-43. The patent also discloses a pitch adjustment feature of the

ORAL ARGUMENT REQUESTED

bracket assembly, which enables the selection and adjustment of the pitch, or angle, of the

awning in its equilibrium (or non-load-shedding) position to be set and adjusted.  See, e.g.,

Ex. A, at Claim 6 (col. 5, ll. 59-60; col. 6 ll. 1-29).[1]

Lukos' company, the plaintiff Eastern, is engaged in the business of manufacturing

and selling awning systems and has been granted an exclusive license to use the '095 Patent.

See Report of Parties Planning Meeting, Statement of Undisputed Facts, filing 10, at 3, ¶¶ 7-

8.  The defendant Harold's Canvas and Awning, Inc. ("HCA"), is a former retailer of

Eastern's products, including awning systems that utilize the plaintiffs' patented technology.

Id. at ¶ 9.  HCA and the defendant Toff Industries, Inc., both of which are owned by the

defendant Harold Toffey,[2] have marketed and sold awning systems that the plaintiffs believe

infringe the '095 Patent.

On May 22, 2001, Eastern and Lukos filed suit in this Court for patent infringement,

alleging that the awning support system marketed and sold by the defendants infringed the

'095 Patent, and for unfair and deceptive trade practices under Connecticut law.  Defendants

answered the Complaint on July 3, 2001.  Thereafter, on October 31, 2001, defendants filed

a motion for summary judgment on all counts of the plaintiffs' Complaint, which motion the

Court denied on or about September 26, 2002.

---

[1]     The '095 Patent contains eleven claims, two of which (claims 1 and 6) are
independent claims that disclose different embodiments of a bracket assembly for the lateral
arm.  The remaining nine claims depend from one of the two independent claims, with claims
two through five depending from independent claim 1 and claims seven through eleven
ultimately depending from independent claim 6.  See Ex. A.
[2]     See Excerpts from the April 18, 2002 Deposition of Harold Toffey, attached hereto as
Exhibit B, at 29-30.

On May 28, 2004, this case was reassigned from Judge Gerard L. Goettel to Judge Robert N. Chatigny. Following the transfer, in a telephonic conference with the Court on July 26, 2004, the parties agreed to file briefs addressed to the Court's construction of element 6(e) of claim 6 of the '095 Patent. On August 5, 2004, the Court ordered the parties to submit simultaneous briefs on the construction of element 6(e) no later than November 1, 2004.

## II.    ARGUMENT

### A.    Governing Standard.

Patent infringement analysis is a two-step process in which the Court first must determine the correct claim scope and then the finder of fact compares the properly construed claim to the accused device in order to determine whether all of the claim limitations are present, either literally or by a substantial equivalent, in the accused device. See Johnson Wordwide Assocs., Inc. v. Zebco Corp., 175 F.3d 985, 988 (Fed. Cir. 1999); General Mills, Inc. v. Hunt-Wesson, Inc., 103 F.3d 978, 981 (Fed. Cir. 1997); Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1581-82 (Fed. Cir. 1996). The first step in the infringement analysis—proper claim construction—is an issue of law for the Court. See Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1456 (Fed. Cir. 1998) (en banc); Markman v. Westview Instruments, Inc., 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370, 116 S. Ct. 1384 (1996).[3] The purpose of this brief, therefore, is to

---

[3]    The second step, which involves the determination of infringement, is a question of fact regardless of whether the infringement is alleged to be literal or pursuant to the doctrine of equivalents. See SRI Int'l v. Matsushita Elec. Corp. of Am., 775 F.2d 1107, 1125 (Fed. Cir. 1985) (en banc); Roton Barrier, Inc. v. Stanley Works, 79 F.3d 1112, 1125 (Fed. Cir. 1996).

assist the Court in constructing the meaning of language contained in element 6(e) of the patent in suit, which is the only element in dispute with regard to whether the defendants infringe claims 6 and 7 of the '095 Patent.

The scope of a patent is defined by the language of the patent claims. See SRI Int'l, 775 F.2d at 1121. Thus, claims construction analysis "must begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to use to 'particularly point[] out and distinctly claim[] subject matter which the patentee regards as [the] invention.'" Interactive Gift Express, Inc. v. Compuserve, Inc., 256 F.3d 1323, 1331 (Fed. Cir. 2001) (quoting 35 U.S.C. § 112, ¶ 2). "It is well-settled that, in interpreting an asserted claim, the court should look first to the intrinsic evidence of record, *i.e.*, the patent itself, including the claims, the specification and, if in evidence, the prosecution history." Vitronics Corp., 90 F.3d at 1582; see also Bell Atl. Network Servs., Inc. v. Covad Communs. Group, Inc., 262 F.3d 1258, 1267 (Fed. Cir. 2001).

Within the body of intrinsic evidence relating to the patent before it, the court first starts with the plain language of the claim itself in defining the scope of the patented invention. See Interactive Gift Express, Inc., 256 F.3d at 1331; Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243, 1248 (Fed. Cir. 1998) ("the claim construction inquiry, therefore, begins and ends in all cases with the actual words of the claim"); Vitronics Corp., 90 F.3d at 1582 (courts look first "to the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention"). Claim terms are given "their ordinary and accustomed meaning as understood by one of ordinary skill in the art." Bell Atl. Network Servs., Inc. , 262 F.3d at 1267 (citations omitted); see also Texas Digital Sys.,

4

Inc. v. Telegenix, Inc., 308 F.3d 1193, 1202 (Fed. Cir. 2002) ("The terms used in the claims bear a 'heavy presumption' that they mean what they say and have the ordinary meaning that would be attributed to those words by persons skilled in the relevant art."). Furthermore, the Court generally affords the claim term the full range of its ordinary meaning. See Texas Digital Sys., Inc., 308 F.3d at 1202.

Dictionaries, encyclopedias and treatises are often used "to assist the court in determining the ordinary and customary meanings of claim terms."[4] Id. at 1202; see also Bell Atl. Network Servs., 262 F.3d at 1267 ("Dictionaries and technical treatises, which are extrinsic evidence, hold a 'special place' and may sometimes be considered along with the intrinsic evidence when determining the ordinary meaning of claim terms."). If a claim term has more than one dictionary definition, the court should consult the intrinsic record "to identify which of the different possible dictionary meanings of the claim terms in issue is most consistent with the use of the words by the inventor." Texas Digital Sys., Inc., 308 F.3d at 1203 (citing cases). Moreover, "[i]f more than one dictionary definition is consistent with the use of the words in the intrinsic record, the claim terms may be construed to encompass all such consistent meanings." Id.

However, the presumption of ordinary meaning of a claim term may be overcome where the patentee has chosen to use claim terms "in a manner clearly inconsistent with the ordinary meaning ...." Id. at 1204 (citing cases); see also Bell Atl. Network Servs., 262

---

[4]    The Federal Circuit is expected to decide in the near future the question of whether the primary source for claim construction should be the specification or the ordinary meaning of the term as defined by a dictionary. See AstraZeneca AB v. Mutual Pharm. Co., Inc., 2004 U.S. App. Lexis 20545, at *12 n.3 (Fed. Cir. Sept. 30, 2004); Phillips v. AWH Corp., 376 F.3d 1382, 1383 (Fed. Cir. 2004).

F.3d at 1268. If the patentee chooses to define a claim term in an unconventional manner, he or she must "clearly set forth" the meaning of the redefined term, and "the specification must exhibit an 'express intent to impart a novel meaning'" to such a redefined term. Bell Atl. Network Servs., 262 F.3d at 1268 (citation omitted); see also Renishaw PLC, 158 F.3d at 1249 ("The patentee's lexicography must, of course, appear 'with reasonable clarity, deliberateness, and precision' before it can affect the claim."); Vitronics Corp., 90 F.3d at 1582.

When, however, the court looks to "the specification to construe claim terms, care must be taken to avoid reading 'limitations appearing in the specification ... into [the] claims.'" Interactive Gift Express, Inc., 256 F.3d at 1331 (citations omitted). There is a "fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification," and "it is useful to remember that [courts] look 'to the specification to ascertain the meaning of the claim term as it is used by the inventor in the context of the entirety of his invention,' and not merely to limit a claim term." Id. at 1331-32 (citations omitted); see also Texas Digital Sys., Inc., 308 F.3d at 1204 (cautioning against consulting the written description and prosecution history prior to ascertaining the ordinary meaning of the disputed claim terms).

Finally, it is only when the meaning of the claim language is not apparent from the intrinsic evidence as a whole that the court considers extrinsic evidence, such as witness testimony, to discern the claim term's meaning. See Interactive Gift Express, Inc., 256 F.3d at 1332 (citing cases); Bell Atl. Network Servs., 262 F.3d at 1268-69. Extrinsic evidence may not be relied upon to alter the ordinary meaning of a claim term or the definition as

6

provided by the intrinsic evidence.  See Interactive Gift Express, Inc., 256 F.3d at 1332;

Vitronics Corp., 90 F.3d at 1583.

### B.    Identification Of Disputed Claim Terms.

The asserted claim in which the disputed claim term is present[5] reads as follows:

### Claim 6
A bracket assembly for a lateral arm of an awning support system, comprising:

       (a)    bracket mounting means to mount said bracket assembly to a surface from which said awning extends;

       (b)    arm mounting means for the vertically pivotal attachment to said bracket mounting means of the proximal end of said lateral arm;

       (c)    spring means operatively connected between said bracket mounting means and said arm mounting means to normally maintain said lateral arm in an equilibrium position, extending outwardly from said surface, but to allow said lateral arm to rotate vertically from said equilibrium position to absorb the vertical component of an excessive load on said awning and/or to permit said awning to shed the condition producing said excessive load, and then to permit said lateral arm to return to said equilibrium position when said vertical component is no longer present;

       (d)    said arm mounting means comprises a horizontal pivot barrel disposed through the distal end of [a[6]] housing and operatively connected to said bracket mounting means; and

       (e)    a threaded vertical pitch adjustment rod **secured against vertical movement** with respect to said bracket mounting means, said pitch adjustment rod threadingly engaging said horizontal pivot barrel so as to selectively raise or lower said horizontal pivot barrel to adjust the equilibrium position of said lateral arm.

(Ex. A, col. 5, l. 59 – col. 6, l. 29) (emphasis added).[7]

---

[5]    Claim 7 of the '095 Patent also has been asserted in this case, but that claim does not separately contain disputed claim language.  Rather, as noted above, claim 7 depends from claim 6, and therefore contains all of the elements of claim 6 (including the element containing disputed claim language).

[6]    See Ex. A at Certificate of Correction.

[7]    For the Court's convenience, the disputed claim terms are shown in bold face type.

C.    **Construction of "Secured Against Vertical Movement."**

1.    Ordinary Meaning

As discussed above, the first step in a claim construction analysis is to discern the

ordinary meaning of the disputed claim terms. See Vitronics Corp., 90 F.3d at 1582. The

ordinary meaning of a claim term is first analyzed by looking to the actual words and context

of the claim. See Renishaw PLC, 158 F.3d at 1248. As quoted above, the language from

claim 6 in dispute in this case concerns element 6(e) of the '095 Patent, which claims:

> (e)    a threaded vertical pitch adjustment rod **secured against vertical movement** with respect to said bracket mounting means, said pitch adjustment rod threadingly engaging said horizontal pivot barrel so as to selectively raise or lower said horizontal pivot barrel to adjust the equilibrium position of said lateral arm.

In this case, it is readily apparent from the face of the claim language, and indeed it is

undisputed, that the sole purpose of element 6(e) is to describe the pitch adjustment operation

of the invention set forth in the '095 Patent.[8]

The clarity of the singular focus of element 6(e) is evident from the last clause of

element 6(e), which describes the relevant operation of the pitch adjustment rod with respect

to the horizontal pivot barrel: "so as to selectively raise or lower said horizontal pivot barrel

to adjust the equilibrium position of said lateral arm." Ex. A, at col. 6, ll. 27-29. This

language at the end of element 6(e) modifies all of the preceding language of element 6(e),

---

[8]    The pitch adjustment operation claimed in the '095 Patent is the process by which the angle of inclination of the lateral awning arm in its equilibrium position is increased or decreased, see, e.g., Ex. A, col. 3, ll. 41-54, as opposed to the load-shedding feature of the invention, which is the process by which the arm rotates vertically from the equilibrium position to absorb and/or shed an excessive load, see, e.g., id., col. 1, ll. 62-68 to col. 2, ll. 1-3.

8

including the language in dispute. Therefore, in construing the terms of element 6(e), the context and actual words of the claim language cannot be ignored—the ordinary meaning of the term "secured" in the context of "secured against vertical movement" must be interpreted in light of the pitch adjustment purpose of element 6(e). See Interactive Gift Express, Inc., 256 F.3d at 1336 (rejecting proffered construction of disputed term as "illogical" and not in "accord with the plain import of the claim language"); Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1306 (Fed. Cir. 1999) (finding "further support for [court's] claim construction in the language of the body of the claims"); Renishaw PLC, 158 F.3d at 1250-51 (construing disputed term in light of the other words in claim).

The defendants, while admitting that element 6(e) concerns only pitch adjustment,[9] have asserted that the language in dispute in element 6(e) would mean that the pitch adjustment rod can have no vertical movement at all, including those situations in which the awning is under a load (e.g., from wind or rain). Such a construction not only is contrary to the language and context of element 6(e) but flies in the face of the common understanding of what is meant by the word "secured" in this context.

The term "secured" has an ordinary and customary meaning when used in conjunction with the prepositions "from" or "against," and the '095 Patent does not re-define or alter that ordinary meaning. Specifically, when "used with *from* or *against*," the ordinary meaning of "secure" is to "guard" or to "make safe." Webster's Third New International Dictionary 2053 (1993) (emphasis in original), attached hereto as Exhibit D. In addition, the ordinary

---

[9] For example, during his deposition Harold Toffey agreed that element 6(e) of the '095 Patent is concerned only with pitch adjustment. See Excerpts from the September 20, 2004 Deposition of Harold Toffey, attached hereto as Exhibit C, at 21.

9

usage of the word "secured" connotes that it is a temporally relative term, as opposed to a temporally absolute term. For example, when used to modify a noun, such as the word "door," the ordinary and common usage of the adjective "secured" connotes an inherently temporary state.[10] See Ex. D.

The application of the ordinary and customary meaning of the word "secured" to the language "secured against vertical movement" comports with the plain language of element 6(e). Upon reviewing the language of element 6(e), it becomes clear that, in order to effect an equilibrium adjustment, the pitch adjustment rod has to be kept from moving vertically with respect to the bracket mounting means after it is threaded into the horizontal pivot barrel so that the horizontal pivot barrel can ride up and down on the pitch adjustment rod. This enables the pitch adjustment rod to be turned (i.e. rotated on its axis), either clockwise or counterclockwise, to selectively raise and lower the horizontal pivot barrel, without allowing

---

[10]    The defendants cannot seriously suggest that the ordinary meaning of the word "secured" carries with it any implied notion of permanency. Throughout this litigation defendants have repeatedly denied that they infringe the '095 Patent because the adjustment rod in their device "moves." At his deposition, for example, Mr. Toffey testified as follows:

> Q.    So the adjustment rod moves?
>
> A.    On my system.
>
> Q.    In your system?
>
> A.    Correct.

See Excerpts from the April 18, 2002 Deposition of Harold Toffey, Ex. B, at 96. Yet, despite this position, defendants themselves recognize that an object can be held secure, but not permanently immobilized, such that the object is otherwise movable. Thus, in discussing the defendants' awning system at his deposition, Mr. Toffey testified as follows:

> Q.    .... Why is it that the pivot barrel rides up and down on the adjustment rod?
>
> A.    Because in a momentary position this bolt is held secure by the strength of the spring and what's called a jam nut which is on top of this plate.

Id. at 108 (emphasis added).

10

the rod to continue screwing in or out of the horizontal pivot barrel (i.e. moving vertically with respect to the bracket mounting means). Element 6(e) thus describes a device which starts with vertical movement (with respect to the bracket mounting means), meaning the rod has to be screwed into and through the horizontal pivot barrel, which entails both axial and vertical movement, but then, in order to adjust the pitch of the awning, the pitch adjustment rod has to be kept (or guarded or made safe) from moving further vertically, while still being permitted to move axially, so that turning the rod axially only raises or lowers the pivot barrel. A person of ordinary skill in the art would understand element 6(e) to operate in precisely this manner, and that the whole purpose of element 6(e) is to describe how the adjustment rod is required to be kept from moving vertically while adjusting the awning's pitch, and thereby its equilibrium. Indeed, the pitch of the awning could not be set or adjusted if the rod was not "secured against vertical movement" at the moment of adjustment.[11]

---

[11]    Significantly, defendants have not disputed this general principle, and have conceded that the pitch of their awning bracket system cannot be adjusted unless the adjustment rod is secured or fixed. See Excerpts from the April 18, 2002 Deposition of Harold Toffey, Ex. B, at 124. With respect to this point, defendants admitted the following [the "bolt" referred to is the vertical pitch adjustment rod in the defendants' accused device]:

> Q.    While you're adjusting the pitch your adjustment rod doesn't move up and down, right?
>
> A.    While you are adjusting the pitch typically no.
>
> Q.    And that's because we talked about how the pivot barrel rides the bolt up and down, correct --
>
> A.    Correct.
>
> Q.    -- the bolt stays fixed, correct?
>
> A.    Correct.

Id., at 124, ll. 7-15.

Read in context, the plain language of element 6(e) also demonstrates that the limitation of "secured against vertical movement" is relative, as opposed to absolute, in that it provides a specific reference point of "secured … with respect to said bracket mounting means." Thus, element 6(e) requires that the pitch adjustment rod be "secured against vertical movement," i.e., guarded against vertical movement, while adjusting the pitch of the awning, i.e., the equilibrium position of the awning arm.

Defendants have disputed this construction and, instead, argued, and presumably will continue to argue, that the word "secured" in "secured against vertical movement" means "stationary." See Ex. C, at 16. More specifically, defendants seek to insert an additional limitation into element 6(e); namely, that the pitch adjustment rod can never move vertically. See Ex. B, at 96. Defendants' proposed construction, however, finds no support in the ordinary meaning of the word "secured" in the context of the phrase "secured against vertical movement" in element 6(e).

The plain language of element 6(e) belies defendants' attempt to narrow the scope of claim 6. Element 6(e) requires only that the pitch adjustment rod be "secured against vertical movement," when adjusting the pitch of the awning. There is no further limitation in either element 6(e) or claim 6 generally that the pitch adjustment rod be secured against vertical movement at all times, including, as the defendants will contend, when the awning is engaged in its load-shedding function. In particular, as demonstrated above, only element 6(e) addresses the pitch adjustment operation of the invention disclosed in the claim. Another element (namely, element 6(c)) describes the load-shedding operation of the invention, and

12

there is no comparable requirement in element 6(c) that, in that context, the pitch adjustment rod be secured against vertical movement.

In addition, as reflected in Exhibit D, no dictionary definition of "secured" supports defendants' restrictive construction of that term, and, indeed, the notion of permanency imparted by the defendants finds no support in any ordinary use of the word "secured." See Moba, B.V. v. Diamond Automation, Inc., 325 F.3d 1306, 1315 (Fed. Cir. 2003) (rejecting proposed construction of "holding" as including a temporal limitation, based in part on the fact that the ordinary dictionary meaning imposed no such requirement). Finally, defendants' attempt to restrict the scope of element 6(e) by inserting limitations not based on the ordinary meaning of the term violates specific canons of claim construction. See, e.g., Moba, B.V., 325 F.3d at 1315 (rejecting proposed construction where "[t]he claims simply do not require a specific temporal limitation associated with the term 'holding'"). Renishaw PLC, 158 F.3d at 1249 (stating that the court may not "add a narrowing modifier before an otherwise general term that stands unmodified in a claim"). Accordingly, defendants' proposed construction based on the ordinary meaning of "secured against vertical movement" must be rejected.

2.     Intrinsic Evidence[12]

After determining the ordinary and customary meaning of a disputed term, the Court should then review the intrinsic evidence to ascertain whether the patentee has used the disputed term in a manner inconsistent with the term's ordinary meaning. See Texas Digital

---

[12]     Given the clarity of the claim language itself, as well as the unambiguous intrinsic evidence, plaintiffs submit that there is no need for extrinsic evidence in construing the phrase "secured." To the extent the defendants argue, and/or the Court determines, otherwise, plaintiffs respectfully reserve the right to present extrinsic evidence as necessary to support their proposed claim construction.

Sys., Inc., 308 F.3d at 1204.

In this case, a review of the specification of the '095 Patent makes clear that the patentee did not act as his own lexicographer by providing a unique definition of the word "secured" in the phrase "secured against vertical movement." In fact, the specification provides further support for the ordinary meaning construction of "secured against vertical movement" as guarded against vertical movement when adjusting the pitch of the awning. For example, in the only instance where the specification explicitly explains the operation of the pitch adjustment rod in adjusting the pitch of the awning, the specification is silent as to whether or not the pitch adjustment rod is capable of vertical movement. See Ex. A, col. 3, ll.42-54. Thus, not only is there an absence of any contradictory intrinsic evidence to plaintiffs' proposed construction of the term "secured against vertical movement," the intrinsic evidence also provides no support to defendants' attempt to add additional limitations into element 6(e).

In sum, the Court should construe the word "secured" within the context of "secured against vertical movement" in element 6(e) to mean "guarded" or "made safe" against vertical movement when adjusting the pitch of the awning (i.e., within the meaning of element 6(e)), "so as to selectively raise or lower said horizontal pivot barrel to adjust the equilibrium position of said lateral arm."

**III.    CONCLUSION**

For the reasons stated above, this Court should construe the meaning of the phrase "secured against vertical movement" in accordance with plaintiffs' proposed construction as set forth herein.

14

PLAINTIFFS,
EASTERN AWNING SYSTEMS, INC., and
STEPHEN LUKOS,

By  *P M Fahey*

Charles L. Howard (ct05366)
Patrick M. Fahey (ct13862)
Lee A. Duval (ct23387)
For Shipman & Goodwin LLP
One Constitution Plaza
Hartford, CT 06103
Telephone: (860) 251-5000
Facsimile: (860) 251-5319
E-mail: pfahey@goodwin.com
Their Attorneys

### CERTIFICATION OF SERVICE

This is to certify that on this 1st day of November, 2004, a copy of the foregoing was

mailed, via U.S. mail, postage prepaid, to:

Thomas G. Parisot, Esq.
Secor, Cassidy & McPartland, P.C.
41 Church Street
P.O. Box 2818
Waterbury, CT 06723-2818

Dallett Hoopes, Esq.
Box 205
Litchfield, CT 06759

*P M Fahey*

Patrick M. Fahey

383514

15