UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| EASTERN AWNING SYSTEMS, INC., and STEPHEN LUKOS, | : | CIVIL ACTION NO. |
| | : | |
| | : | 3:01cv912 (RNC) |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| HAROLD'S CANVAS AND AWNINGS, INC., TOFF INDUSTRIES, INC. and HAROLD TOFFEY, | : | |
| | : | |
| | : | |
| | : | |
| Defendants. | : | NOVEMBER 22, 2004 |

### PLAINTIFFS' MEMORANDUM OF LAW IN RESPONSE TO DEFENDANTS' CLAIMS CONSTRUCTION BRIEF

The plaintiffs, Eastern Awning Systems, Inc., and Stephen Lukos, hereby respectfully submit this memorandum of law in response to defendants' Motion for Summary Judgment Pursuant to Rule 56(c) and supporting memorandum, both filed November 2, 2004 ("Summary Judgment Motion"). Both the instant memorandum and Plaintiffs' Memorandum of Law Regarding Claim Construction (filing # 69) are submitted in response to the Court's August 5, 2004 Order ("August Order"), directing the parties to submit simultaneous briefs on the construction of element 6(e) of United States Patent Number 5,273,095 (the "'095 Patent"). (See filing # 67).

Despite defendants' assertion during the November 12, 2004 telephonic conference with this Court that their November 2, 2004 filing was intended to be the defendants' submission concerning the construction of element 6(e), a review of the Summary Judgment Motion indicates that it is essentially a summary judgment brief rather than a memorandum

**ORAL ARGUMENT REQUESTED**

on claims construction.[1] In fact, but for a series of irrelevant quotations from depositions taken over the course of this litigation, which clearly constitute evidence extrinsic to the '095 Patent, the defendants' submissions are essentially identical to their first premature attempt at summary judgment filed in this matter in October, 2001. As was the case then, the defendants presently make absolutely no attempt to engage in any analysis or construction of the patent claims at issue in this case, but rather they urge this Court to enter summary judgment against the plaintiffs on liability. In the absence of a judicial determination of what is encompassed by the '095 Patent, however, the defendants' efforts are futile.

The defendants' Summary Judgment Motion does not present this Court with any analysis focusing on the proper construction of element 6(e), whether contrary to that set forth in Plaintiffs' Memorandum of Law Regarding Claim Construction (filing # 69) ("Opening Memorandum") or otherwise. Accordingly, for the reasons set forth in the Opening Memorandum, as well as those set forth herein, plaintiffs respectfully request that the Court construe the word "secured" within the context of "secured against vertical movement" in element 6(e) of the '095 Patent to mean "guarded" or "made safe" against

---

[1] In the November 12, 2004 telephonic conference the defendants asserted that their Summary Judgment Motion was, in fact, the defendants' claim construction brief. As a result, and as made clear in that conference, plaintiffs are responding to the Summary Judgment Motion on the sole issue of claim construction, as opposed to treating it as a summary judgment motion pursuant to Fed. R. Civ. P. 56. Thus, in addition to withholding their responses as to the factual and legal infringement arguments propounded by the defendants in their submissions, the plaintiffs also do not respond herein to, among others, the incorrect and contested assertions that claim 6 of the '095 Patent is the only claim alleged to be infringed in this case and that the claim alleging a violation of the Connecticut Unfair Trade Practices Act is duplicative of, or co-extensive with, the plaintiffs' patent infringement claim. Moreover, the plaintiffs do not respond herein to the defendants' summary judgment argument, which constitutes the bulk of the brief, that the doctrine of equivalents cannot apply to the '095 Patent.

vertical movement when adjusting the pitch of the awning (i.e., within the meaning of element 6(e)), so as to enable one using the invention disclosed in claim 6 "to selectively raise or lower said horizontal pivot barrel to adjust the equilibrium position of said lateral arm," as dictated in element 6(e) of claim 6.

I.   BACKGROUND

As set forth in Plaintiffs' Opening Memorandum, the invention disclosed in the '095 Patent relates to a bracket assembly for the lateral arm of an awning system that enables the arm to rotate vertically from its equilibrium position in order to absorb and shed an excessive load on the awning (from, for example, the pressure of wind or rain) and then return to its equilibrium position, thus avoiding serious damage to the awning and/or the attached structure. (See, e.g., Opening Mem., Ex. A, at col. 1, ll. 13-43). The patent also discloses a pitch adjustment feature of the bracket assembly, which enables the selection and adjustment of the pitch, or angle, of the awning in its equilibrium (or non-load-shedding) position. (See, e.g., Opening Mem., Ex. A, at Claim 6 (col. 5, ll. 59-60; col. 6 ll. 1-29)).

The defendants cannot dispute that the invention disclosed in the '095 Patent has primarily two separate features: (1) load shedding and (2) pitch adjustment. The defendants' Motion for Summary Judgment, however, assiduously avoids any discussion, much less recognition, of the pitch adjustment feature of the invention or of the accused device. Yet, an understanding of these distinct features is essential to interpreting the disputed claim language at issue in this case, for, in the context of claim 6, it is abundantly clear the element 6(e)—the element containing the disputed claim language "secured against vertical movement"—is

3

concerned only with the adjustment of the pitch of the awning arm in its equilibrium state. Another element (namely, element 6(c)) describes the load-shedding operation of the invention, and there is no comparable requirement in element 6(c) that, in that context, the pitch adjustment rod be secured against vertical movement.

In addition to essentially ignoring the pitch adjustment aspects of the invention disclosed in the '095 Patent, the defendants also fail to proffer any construction of any disputed claim language that would enable either this Court or the plaintiffs to garner some understanding of what the defendants believe is claimed by the '095 Patent. Viewed in this light, the plaintiffs' arguments submitted in support of their claims construction position in this matter are unopposed, and the defendants have failed to come forward with any reason why this Court should not adopt the plaintiffs' proposed interpretation.

II.   **DEFENDANTS' SUMMARY JUDGMENT MOTION FAILS TO OFFER ANY CLAIMS CONSTRUCTION OR ANALYSIS OF THE PATENT IN SUIT**

As set forth in the Opening Memorandum, patent infringement analysis is a two-step process in which the Court first must determine the correct claim scope and then the finder of fact compares the properly construed claim to the accused device in order to determine whether all of the claim limitations are present, either literally or by a substantial equivalent, in the accused device. (See Opening Mem. at 3 (citing cases)). The first step in the infringement analysis—proper claim construction—is an issue of law for the Court. (See id.). The second step, which involves the determination of infringement, is a question of fact. (See id. at 3 n.3). The August Order required the parties to submit briefs singularly addressed to step one of the analysis, claim construction. (See filing # 67 at ¶¶ 2-3).

4

Notwithstanding defendants' awareness of this two-step process (see Defs.' Brief at 3) and the unambiguous requirements of the August Order, the defendants have chosen to ignore the first step and have instead focused their efforts on step two—whether or not the defendants' accused device infringes the '095 Patent. This tactical decision is readily apparent from the face of the defendants' Summary Judgment Motion, which seeks the entry of summary judgment on the grounds that "there is no literal infringement of the '095 patent nor is the 'doctrine of equivalents' available to the plaintiffs to support their claim of infringement." (filing # 72 at 1; see also Defs.' Brief at 3). Significantly, in seeking relief from the Court, defendants make no mention of how the disputed terms in element 6(e) should be construed. See Rexnord Corp. v. Laitram Corp., 274 F.3d 1336, 1343 (Fed. Cir. 2001) ("[T]he parties should provide the district court with all relevant arguments and point out with specificity the relevant statements in the specification and prosecution history in support of their arguments.").

In addition, although the defendants apparently agree that the disputed terms in element 6(e) are "secured against vertical movement" (Defs.' Brief at 7), defendants make no attempt to assist the Court in construing the meaning of that language in the context of the '095 Patent. Defendants' focus on the "infringement determination" (Defs.' Brief at 6) is irrelevant to the initial step of claims construction and renders irrelevant significant portions of the Summary Judgment Motion for the purpose of construing the disputed terms of element 6(e). As one example, the entire discussion regarding the alleged prosecution history estoppel, and the corresponding argument that the doctrine of equivalents cannot be applied in this case (Defs.' Brief at 7-9, 13-19), simply do not pertain to claim construction. See, e.g.,

Southwall Techs., Inc. v. Cardinal IG Co., 54 F.3d 1570, 1578 (Fed. Cir. 1995) ("Claim interpretation in view of the prosecution history is a preliminary step in determining literal infringement, while prosecution history estoppel applies as a limitation on the range of equivalents if, after the claims have been properly interpreted, no literal infringement has been found.... The limit on the range of equivalents that may be accorded a claim due to prosecution history estoppel is simply irrelevant to the interpretation of those claims.").

The most telling example of the absence of claim construction analysis in the Summary Judgment Motion is the defendants' attempt to limit the invention claimed in the '095 Patent to Figure 5 of the patent specification, as opposed to the claim language itself.[2] (See Defs.' Brief at 4 ("The structure and operation of the assembly of '095 Patent ... may be explained with reference to Fig. 5 of the patent ....")). This fundamental flaw in reasoning infects the defendants' entire brief and renders it impossible to discern from it any reasoned analysis of claim 6 of the '095 Patent.

The only colorable argument contained in the Summary Judgment Motion that remotely approaches any attempt at construing the disputed claim terms is the defendants' half-hearted effort to contrast the disputed claim language with the defendants' description of the accused device's structure. (See Defs.' Brief at 10-11). Specifically, defendants contrast

---

[2] Interestingly, the defendants' characterization of Figure 5 makes undeniable their concession that an object may be held in "fixed" position at one point in time and, yet, movable at another point in time. Defendants describe the "housing 22" as being held "in fixed position." (Defs.' Brief at 4). However, by simple reference to the '095 Patent at col. 5, ll. 23-25, it is evident that the "housing" is part of the lateral arm of the awning system, which arm rotates vertically when operating in its load-shedding capacity or when its equilibrium position, i.e., its pitch, is adjusted.

the disputed claim terms with the statement that the vertical pitch adjustment rod in the accused device (i.e., "bolt 86") "is vertically movable as the spring yields ...." (Id. at 10). Defendants seem to claim that, because the vertical pitch adjustment rod in the accused device moves during its load-shedding operation, the pitch adjustment rod cannot possibly be considered "secured against vertical movement" within the meaning of claim 6 of the '095 Patent.[3] Defendants, however, never explain their construction of the meaning "secured against vertical movement" as used in element 6(e) of the '095 Patent; moreover, as explained in the Opening Memorandum, a construction requiring that the pitch adjustment rod never be permitted to move vertically—that it be absolutely and at all times fixed in position—is contrary to both the ordinary meaning of the word "secured" in the context of element 6(e) and the claim language itself.

In addition, to employ the methodology invited by the Summary Judgment Motion as one pertaining to claims construction would turn the process of claims construction on its head. The methodology would entail starting, not with the language actually employed by the inventor in the claims of the patent at issue, but with a feature claimed with regard to the accused device (in this case, a vertical pitch adjustment rod capable of some movement when the device is engaged in load shedding, see Defs.' Brief at 10-11). The methodology would

---

[3] Conspicuously absent from the Summary Judgment Motion is any discussion of the pitch adjustment operation of the accused device. This absence is surprising given the level of detail and attention provided in the Summary Judgment Motion and Affidavit of Harold J. Toffey (Defs.' Brief at Ex. B) in describing the structure of the accused device and its operation during load-shedding, as well as the undisputed fact that element 6(e) is solely concerned with pitch adjustment. Although irrelevant for purposes of claim construction, it is telling that the Summary Judgment Motion is silent regarding the vertical movement of the pitch adjustment rod in the accused device when the rod is used to adjust the awning's pitch. (See also Opening Mem. at 11 n.11).

then require an examination of only a single embodiment of the invention disclosed by way of a drawing included in the specification (in this case, Figure 5 of the '095 Patent discussed by Erling Smith and quoted at page 11 of the defendants' brief) or a commercial embodiment of the invention (in other words, a product actually produced by the patentee under the patent, such as the Eastern Awning device discussed by Edward Keough and quoted at page 12 of the defendants' brief), to determine whether the component of the accused device is absent in the embodiment.[4] If, as defendants contend here, the component of the accused device is absent, the language of the asserted patent must necessarily be construed in a way to exclude the accused device from the scope of the patent. Of course, one following this methodology would have never to actually confront the language actually employed in the patent claim in order to determine its scope.

---

[4]    As noted in their Opening Memorandum, the plaintiffs contend that the '095 Patent can be, and therefore should be, construed in this matter without examining evidence extrinsic to the patent record. Thus, the deposition testimony offered by the defendants, even if it were relevant on the issue of claims construction, should be disregarded by this Court. It is interestingly to note, however, that Mr. Keough's testimony concerning the language of element 6(e) of claim 6, as opposed to the "device" produced by plaintiff Eastern Awning, is entirely in accordance with the plaintiffs' proffered construction of the patent:

> Q.    When you say this bolt, you're talking about bolt 84/82 on the Toffey device?
>
> A.    That's right. It is secured against vertical movement by the spring from upward vertical movement, and it is secured against downward vertical movement by a threaded nut, as I stated earlier. That's my observation.
>
>     When load is applied, then yes, the bolt 84/82 can move.
>
>     As I read section 6E [element 6(e) of claim 6], I don't know whether it can move or not. It doesn't say. It just says that it [the vertical pitch adjustment rod] is secured against vertical movement.

Excerpts of Deposition of Edward Keough, attached hereto as Exhibit A, at 41.

8

Such a method of construing claims runs counter to clear Federal Circuit precedent and is doomed to fail for the simple reason that a patent "applicant is not required to describe in the specification every conceivable and possible future embodiment of his invention." Rexnord Corp. v. Laitram Corp., 274 F.3d 1336, 1344 (Fed. Cir. 2001). As was made clear in plaintiffs' Opening Memorandum, it is improper to use the specification, which includes the drawings, to limit the claim language. (See Opening Mem. at 6 (citing cases)). Rather, the claims construction analysis "must begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to use to 'particularly point[] out and distinctly claim[] subject matter which the patentee regards as [the] invention.'" Interactive Gift Express, Inc. v. Compuserve, Inc., 256 F.3d 1323, 1331 (Fed. Cir. 2001) (quoting 35 U.S.C. § 112, ¶ 2); see also Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc., 381 F.3d 1111, 1115 (Fed. Cir. 2004) ("It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude.") (emphasis added). As the Federal Circuit has cautioned, "[i]f structural claims were to be limited to devices operated precisely as a specification-described embodiment is operated, there would be no need for claims.... In short, it is the claims that measure the invention, as informed by the specification." Rexnord Corp., 274 F.3d at 1344 (citation omitted); see also SRI Int'l v. Matsushita Elec. Corp. of Amer., 775 F.2d 1107, 1118 (Fed. Cir. 1985) ("It is only after the claims have been construed without reference to the accused device that the claims, as so construed, are applied to the accused device to determine infringement.") (en banc) (emphasis in original).

### III. "SECURED AGAINST VERTICAL MOVEMENT" SHOULD BE CONSTRUED IN ACCORDANCE WITH PLAINTIFFS' OPENING MEMORANDUM.

There is nothing in the Summary Judgment Motion that challenges, contests or conflicts with the claim construction analysis set forth by the plaintiffs in their Opening Memorandum. Indeed, the Summary Judgment Motion provides no reason to question the plaintiffs' basic claim construction arguments: 1) that the ordinary and customary meaning of the word "secured," when used with the prepositions "from" or "against," is to "guard" or to "make safe" and is a temporally relative term, as opposed to a temporally absolute term; 2) the ordinary and customary meaning of "secured" comports with the plain language of element 6(e); and 3) there is no basis found in the intrinsic evidence which would justify a construction of "secured" as used in element 6(e) in a manner contrary to its ordinary and customary meaning.

In addition, the defendants cannot contest the fact that the invention disclosed in the '095 Patent enables two independent operations, namely, load shedding and pitch adjustment. While the defendants assiduously focus on the load-shedding operation in the Summary Judgment Motion, it is undisputed that element 6(e) – the only element containing the disputed terms – is solely concerned with pitch adjustment.[5]

The defendants' arguments offered in support of the Motion for Summary Judgment are founded on the premise that this Court already has construed the disputed language "secured against vertical movement" to inherently disclose a permanently immoveable state. As argued in the plaintiffs' Opening Memorandum, however, when read in context, element

---

[5] As noted above, a separate element of claim 6, specifically 6(c), describes the load-shedding operation of the invention, and there is no comparable requirement in element 6(c) that, in that context, the pitch adjustment rod be secured against vertical movement.

6(e) discloses no such limitation. Moreover, the defendants' desire to import such a temporal limitation finds no support in either element 6(e) or the specification of the '095 Patent. Finally, while recognizing that it is "not an absolute rule," the Federal Circuit has held that "all claim terms are presumed to have meaning in a claim." <u>Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.</u>, 381 F.3d 1111, 1119 (Fed. Cir. 2004). Adopting the defendants' implicit definition of the disputed claim term at issue, however, would essentially read out of element 6(e) the phrases "with respect to said bracket mounting means" and "so as to selectively raise or lower said horizontal pivot barrel to adjust the equilibrium position of said lateral arm."

Accordingly, the Court should construe the word "secured" within the context of "secured against vertical movement" in element 6(e) to mean "guarded" or "made safe" against vertical movement when adjusting the pitch of the awning (i.e., within the meaning and context of element 6(e)), "so as to selectively raise or lower said horizontal pivot barrel to adjust the equilibrium position of said lateral arm."

## IV.  CONCLUSION

For the reasons stated above and in the plaintiffs' Opening Memorandum, this Court should construe the meaning of the phrase "secured against vertical movement" in accordance with plaintiffs' proposed construction as set forth therein.

11

PLAINTIFFS,
EASTERN AWNING SYSTEMS, INC., and
STEPHEN LUKOS,

By _____/s/ PM Fahey_____
Charles L. Howard (ct05366)
Patrick M. Fahey (ct13862)
Lee A. Duval (ct23387)
For Shipman & Goodwin LLP
One Constitution Plaza
Hartford, CT 06103
Telephone: (860) 251-5000
Facsimile: (860) 251-5319
E-mail: pfahey@goodwin.com
Their Attorneys

### CERTIFICATION OF SERVICE

This is to certify that on this 22nd day of November, 2004, a copy of the foregoing was mailed, via U.S. mail, postage prepaid, to:

Thomas G. Parisot, Esq.
Secor, Cassidy & McPartland, P.C.
41 Church Street
P.O. Box 2818
Waterbury, CT 06723-2818

Dallett Hoopes, Esq.
Box 205
Litchfield, CT 06759

_____/s/ PM Fahey_____
Patrick M. Fahey

386880

# EXHIBIT A

## Page 1

```
             UNITED STATES DISTRICT COURT
                DISTRICT OF CONNECTICUT

---------------X
EASTERN AWNING SYSTEM, INC.:  CIVIL ACTION NO.
And STEPHEN LUKOS,         :
       Plaintiffs,         : 3:01CV912 (GLG)
                           :
HAROLD'S CANVAS AND AWNINGS:
INC. TOFF INDUSTRIES, INC. :
AND HAROLD TOFFEY,         : APRIL 25, 2002
       Defendants.         :
---------------X

        DEPOSITION OF EDWARD KEOUGH

Taken before Denise L. Gunther, LSR #182,
a Court Reporter and Notary Public, within
and for the State of Connecticut, pursuant
to Notice and the Connecticut Practice Book,
at the Law Offices of SECOR, CASSIDY &
McPARTLAND, 41 Church Street, Waterbury,
Connecticut, commencing at 9:30 a.m.




              GERSON REPORTING SERVICE
                    P. O. Box 687
              Waterbury, Connecticut 06720
                    (203)754-2024
```

## Page 2

**APPEARANCES:**

**FOR THE PLAINTIFFS:**
SHIPMAN & GOODWIN, LLP
One American Row
Hartford, Connecticut 06103-2819
(860)251-5699
BY: CHARLES L. HOWARD, ESQ.

**FOR THE DEFENDANTS:**
SECOR, CASSIDY & McPARTLAND
41 Church Street
Waterbury, Connecticut 06723
(203)757-9261
BY: THOMAS G. PARISOT, ESQ.
DALLETT HOOPES, ESQUIRE

## Page 3

STIPULATIONS

It is stipulated by counsel for the parties that all objections are reserved until the time of trial, except those objections as are directed to the form of the question.

It is stipulated and agreed between counsel for the parties that the proof of the authority of the Notary Public before whom this deposition is taken is waived.

It is further stipulated that any defects in the Notice are waived.

It is further stipulated that the deposition may be signed before any Notary Public.

## Page 4

(Deposition commenced: 9:30 a.m.)

EDWARD KEOUGH, Deponent, of 9 Becket Village, Sandy Hook, Ct. 06482, being first duly sworn by the Notary Public, was examined and testified, on his oath, as follows:

DIRECT EXAMINATION

BY MR. PARISOT:

Q  Mr. Keough, good morning. My name is Tom Parisot. I represent the defendants in the lawsuit that Eastern Awning Systems has commenced against Toff Industries and a number of defendants - - against Toff Industries, Harold's Canvas and Awnings and Harold Toffey.

We are going to take your deposition over the next hour or so. And it's a question and answer session.

Have you ever been through this process before?

A  No.

Q  I'm sure that your attorney has explained

37

1 Q But I take it you agree that if a load is
2 placed on the arm, such that it's pulled down, the
3 ultimate mechanical functioning of the device will
4 result in bolt 84, 82 moving vertically?
5 A Yes, under load.
6 Q I would like you to turn back to the
7 Declaration, Mr. Keough, which is marked Exhibit
8 Three for Identification. And if we can go to
9 paragraph 7E, which I believe is on the last page.
10 You may need to read the beginning of 7
11 first. Then you can go to E.
12 A Okay. 7E on my Declaration.
13 Q Have you read through that?
14 A Yes.
15 Q In your Declaration of paragraph 7E, you
16 have indicated that the vertical pitch adjustment
17 rod of Mr. Toffey's product is secured against
18 vertical movement with respect to the bracket
19 mounting means, correct?
20 A That's correct.
21 Q But that statement isn't accurate, is it?
22 A I believe it is accurate.
23 Q How do you claim that bolt 84, 82 is
24 secured against vertical movement with respect to
25 the bracket mounting means?

38

1 A It is secured against vertical movement
2 from two sides. It is secured against vertical -
3 upward vertical movement by the spring, and it is
4 secured against downward vertical movement by a nut
5 that is threaded onto the bolt that is not visible
6 in this image.
7 MR. HOWARD: Meaning Exhibit One.
8 A Exhibit One.
9 Q But there is no question, is there, that
10 that bolt, 84, 82, which we call in your Declaration
11 the vertical pitch adjustment rod, moves vertically
12 when a load is applied, correct?
13 A When a load is applied, the bolt will
14 move, yes.
15 Q Now, there is a vertical pitch adjustment
16 rod in the Lukos, or the Sun Flex, shoulder joint as
17 well, correct?
18 A There is one in the current shoulder
19 joint, and there is one referred to - - When I was
20 writing this Declaration, I was comparing it to the
21 patent.
22 Q Let's talk about the one that is
23 described in the patent. There is a vertical pitch
24 adjustment rod there as well, correct?
25 A Yes. There is a point, as I said

39

1 earlier, on the page that you referred to, the last
2 page of the patent.
3 MR. HOWARD: Why don't we call it
4 page 65, just for the record.
5 A Yes, there is a page 65 designation at
6 the bottom. And I compared paragraph, I believe,
7 6E, and how that is described, the vertical pitch
8 adjustment rod is secured against vertical movement.
9 That description there is where I
10 compared that to the Toff Industries shoulder joint.
11 Q And isn't it true that the vertical pitch
12 adjustment rod in the Lukos patent will not move
13 vertically when a load is applied to the front rail
14 or to the lateral arm?
15 A That is correct.
16 Q So it's different in how it can move when
17 you compare it to the Toff, bolt 84, 82, correct?
18 A It's different - what - - Could you
19 please restate that?
20 Q Yes. It functions in a different manner
21 when a load is applied to the lateral arm, than bolt
22 84, 82 does in the Toff product?
23 MR. HOWARD: Objection to the form
24 of the question. Are you referring to
25 the actual device that Eastern Awning

40

1 makes?
2 MR. PARISOT: No. The question is
3 directed to the vertical pitch adjustment
4 rod in the Lukos device.
5 A As I read Section 6E, it says that the
6 vertical movement with respect to said bracket
7 mounting - - I don't necessarily need to read that
8 out loud. Bear with me one second.
9 Section 6E says that the vertical pitch
10 adjustment rod is secured against vertical movement
11 with respect to said bracket mounting means.
12 It doesn't say here how it's secured or
13 whether it will move or not.
14 It strictly says that it is secured
15 against vertical movement.
16 Q Well, if something is secured against
17 vertical movement, it won't move up, correct?
18 MR. HOWARD: Object to the form
19 of the question. You may answer.
20 A If something is secured against movement
21 - -Yes, it is secured against movement. However,
22 what I'm saying here is that I believe that this
23 bolt is also secured against movement.
24 Q When you say this bolt, you're talking
25 about bolt 84/82 on the Toffey device?

41

1  A  That's right. It is secured against
2  vertical movement by the spring from upward vertical
3  movement, and it is secured against downward
4  vertical movement by a threaded nut, as I stated
5  earlier. That's my observation.
6      When load is applied, then yes, the bolt
7  84/82 can move.
8      As I read section 6E, I don't know
9  whether it can move or not. It doesn't say. It
10 just says that it is secured against vertical
11 movement.
12  Q  But you know in the Lukos device the
13 vertical pitch adjustment bolt doesn't move
14 vertically when a load is applied?
15  A  In the device as we produce it today?
16  Q  Yes.
17  A  That's correct.
18  Q  There is something I forgot to ask you
19 earlier.
20     You indicated you graduated from St.
21 Michael's up there in Winooski back in 1982. What
22 was your major, Mr. Keough?
23  A  Business.
24  Q  Have you had any engineering background
25 or take any course work in engineering along the

42

1  way?
2  A  No.
3  Q  How about in drafting?
4  A  No.
5  Q  Any sort of mechanical design courses?
6  A  No courses along those lines. My
7  experience comes from good mechanical aptitude,
8  being in the hardware industry and general
9  experience in this business.
10  Q  The Lukos shoulder joint does not have a
11 coil spring, correct?
12  A  As we produce it today?
13  Q  Yes, sir.
14  A  Correct.
15  Q  What is used as a spring mechanism?
16  A  It's a urethane -- the spring mechanism
17 is a urethane composite material.
18  Q  And when a downward load is place on the
19 lateral arm, as I understand it, that urethane
20 material will compress?
21  A  That's correct.
22  Q  Is that correct?
23  A  That is correct.
24  Q  Do you know whether any testing has been
25 done to determine the speed at which that urethane

43

1  component will compress and the speed at which it
2  will return to its equilibrium position once a load
3  is removed?
4  A  I'm not aware of any testing for speed.
5  Q  Do you market - Does Eastern market its
6  shoulder joint as being one that is intended to
7  handle both rain loads and wind loads on awnings?
8  A  Yes.
9  Q  Do you know if any testing has been done
10 to determine how efficiently the Eastern product
11 handles a wind load on an awning?
12  A  Yes. We have had engineering testing
13 done regarding wind loads on the Sun Flex awning.
14  Q  What did those test results determine?
15  A  They determined the maximum safe
16 allowable wind load for the Sun Flex awning. And we
17 publish that in our sales and marketing materials.
18  Q  What is that wind load?
19  A  It varies based on size of the awning.
20  Q  Is there a range?
21  A  There is a range. I would have to get
22 documents to tell you what that range is. I can
23 give you an approximate range.
24  Q  We understand it's an estimate.
25     MR. HOWARD: I don't want you to

44

1  guess.
2  A  I know it ranges from a minimum of 32
3  miles an hour on any published sizes. And the
4  maximum is approximately 60 miles an hour.
5     MR. PARISOT: If you want to give
6  us just two minutes.
7     (The proceedings briefly went
8  off the record.)
9  BY MR. PARISOT:
10  Q  Just a few more questions, Mr. Keough.
11 We are just about done.
12  A  Sure.
13  Q  Turning back to Exhibit One, and the
14 diagram of the Toffey device, I want you to direct
15 your attention again to that bolt that we have been
16 calling bolt 84/82, correct?
17  A  Correct.
18  Q  And you indicated that your observation
19 led you to conclude that it was secured against
20 vertical movement, in part, because of spring 86, is
21 that correct?
22  A  Right. It's secured against upward
23 vertical movement by spring number 86.
24  Q  And there is no question, is there, that
25 a spring is a device to control movement, correct?