# EXHIBIT A

1    UNITED STATES DISTRICT COURT

2    DISTRICT OF CONNECTICUT

3

4    ------------------------x

5    EASTERN AWNING SYSTEMS,

6    INC., AND STEPHEN LUKOS,   :

7              Plaintiffs,   :

8         -versus-        : No. 3:01CV912(GLG)

9    HAROLD'S CANVAS AND
     AWNINGS, INC., TOFF
0    INDUSTRIES, INC., AND
     HAROLD TOFFEY,           :

1

2              Defendants.   :

3    ------------------------x

4

5              Deposition of HAROLD TOFFEY, taken

6    pursuant to Federal Rules of Civil Procedure, at the

7    law offices of Shipman & Goodwin, Hartford,

8    Connecticut, before Jacqueline McCauley, RPR/CSR, a

9    Notary Public in and for the State of Connecticut, on

0    April 18, 2002, at 10:06 a.m.

1

2

3

4

5

1    replacing the fabric?

2              A.    Yes.

3              Q.    Anything else?

4              A.    No, that was it. From that day on I've

5    been in business for myself.

6              Q.    How long did you run the Watertown Auto

7    Upholstery?

8              A.    Watertown Auto Upholstery was Watertown

9    Auto Upholstery up until about 1986 where I changed

10   the name to Watertown Auto Upholstery Canvas and

11   Awning.

12             Q.    And why did you change the name?

13             A.    Because at that time I started to

14   diversify.  I moved into the field of awnings and

15   canopies.

16             Q.    And that was around 1986?

17             A.    It's hard to remember.  No, actually I

18   think it was around '84.

19             Q.    When you say you started to diversify into

20   other areas, can you explain what new things you

21   started doing?

22             A.    I started to manufacture canvas awnings

23   and canopies.

24             Q.    Actually manufacturing?

25             A.    Yes.

1      Q.   Have you been in that business ever since

2    1984?

3      A.   Yes.

4      Q.   Did there come a time when that became

5    your exclusive business?

6      A.   Yes.

7      Q.   So you no longer do the auto upholstery or

8    the boat upholstery work?

9      A.   Correct.

10      Q.   And about when did that happen?

11      A.   That was somewhere in the vicinity of 1988

12    and I changed the name a third time and I was just

13    Watertown Canvas and Awning.

14      Q.   And what did Watertown Canvas and Awning

15    do?

16      A.   We manufactured and installed and retailed

17    awnings and canopies.

18      Q.   What kinds of awnings did you -- strike

19    that.  Did you manufacture awnings?

20      A.   Yes.

21      Q.   What kind of awnings did you manufacture?

22      A.   Commercial awnings, window awnings for

23    residential, patio awnings, canopies.

24      Q.   Where did you manufacture these awnings?

25      A.   Well, the original location was in

1        A.   Yes.

2        Q.   Now looking at Plaintiff's 5 for

3   identification, by looking at this exhibit can you

4   tell me how the pitch is changed?

5        A.   On Plaintiff's Exhibit number 5, number 84

6   is a hex bolt, which is the vertical adjustment bolt

7   and by turning it clockwise the pitch of the awning is

8   sent in an upward position.  By turning it

9   counterclockwise it's brought down.

10       Q.   So you screw the bolt in and the pitch

11  goes up?

12       A.   Correct.

13       Q.   And you loosen the bolt and the pitch goes

14  down; is that right?

15       A.   That's correct.

16       Q.   And could you explain to me how

17  mechanically that happens by referring to Plaintiff's

18  5 for identification?

19       A.   Referring to the component I call the jaw,

20  number 72, the jaw pivots on a horizontal bolt, number

21  70.  The adjustment for the pivot is achieved by the

22  vertical bolt, number 84, 82, turning clockwise or

23  counterclockwise into part number 78, which is a

24  threaded barrel which will, as you turn clockwise,

25  drawdown on the threads causing the pivot point to

1  move the arm in an upward position or turning

2  counterclockwise allowing it to go up and letting the

3  arm drop.

4          Q.   So am I correct in understanding that

5  number 78 on Plaintiff's Exhibit 5 is threaded?

6          A.   Yes.

7          Q.   And that bolt 82 is also threaded?

8          A.   Yes.

9          Q.   And that bolt 82 engages the threads in

10  piece 78?

11          A.   That's correct.

12          Q.   And is it fair to say that that 78 barrel

13  rides up and down on the adjustment rod?

14          A.   On the threads of the adjustment rod,

15  correct.

16          Q.   Would you agree with me, Mr. Toffey, that

17  your adjustment rod is moveable?

18          A.   Yes.

19          Q.   And by that I mean it is at least

20  moveable?  It can be, for lack of a better word,

21  tightened and loosened, correct?

22          A.   Tightened and loosened?

23          Q.   The bolt can be screwed clockwise or

24  unscrewed counterclockwise; is that fair to say?

25          A.   Yes.

1         Q.   And during that process that bolt is

2    moving, correct?

3         A.   Yes.

4         Q.   And it's moving around, right?

5         A.   Yes, it is.

6         Q.   And that's what happens when you turn the

7    bolt on the bottom, correct?

8         A.   Yes.

9         Q.   I am probably using the wrong word, but

10   the piece that's identified as number 84 on

11   Plaintiff's 5?

12        A.   Is the head of a bolt.

13        Q.   Why doesn't the bolt just keep screwing

14   into the pivot barrel?

15        A.   Why doesn't it just keep going up?

16   Because the spring has so much tension it holds it

17   from moving upward until a tremendous amount of

18   pressure from the front causes that spring to collapse

19   and then the bolt moves in the upward position.

20        Q.   And I'm sorry, I am still talking about

21   the adjusting part.  When I'm rotating number 84

22   clockwise, what's happening to piece 78, if I

23   understand your testimony, is it's moving downward?

24        A.   Yes.

25        Q.   And my question is what's stopping the

1    bolt, 84 and 82, from just continuously screwing

2    itself into piece 78?

3              A.   I'm not sure I understand your question.

4              Q.   Let me rephrase it, because I don't mean

5    to confuse you and I'll ask it a different way.   Why

6    is it that the pivot barrel rides up and down on the

7    adjustment rod?

8              A.   Because in a momentary position this bolt

9    is held secure by the strength of the spring and

10   what's called a jam nut which is on top·of this plate.

11             Q.   And you're pointing now at Plaintiff's 20

12   for identification, correct?

13             A.   Yeah, or we can go back to Plaintiff's 5

14   and the plate I am referring to is number 66.

15             Q.   And is it fair to say that that jam nut

16   isn't depicted on either --

17             A.   You can't see it on either of these.

18             Q.   On either Plaintiff's 5 or Plaintiff's 20,

19   correct?

20             A.   Correct.

21             Q.   And do I understand your testimony to be

22   that that jam nut plays a role in the pivot barrel's

23   riding the adjustment rod up and down rather than the

24   bolt going through the pivot barrel?

25             A.   No, that's not its function.

1          Q.   Okay.   Then I need you to explain to me

2     again why it is that this pivot barrel, number 78,

3     just rides up and down on that pivot adjustment rod.

4          A.   Well, the only way I can explain it to you

5     is let's say this is the bolt and it's got threads

6     from here to here and the barrel is on that here.   As

7     you turn this, that barrel will come down to a certain

8     point where it can't go anywhere, because it's hitting

9     this plate whereas you turn it counterclockwise it⁻

10    will go up until it can't go any father, because it's

11    hitting this upper plate, number 68.

12         Q.   68 doesn't have a hole in it?

13         A.   Yes, it does.

14         Q.   And that hole doesn't admit the pivoted

15    adjustment rod through the hole?

16         A.   Yes, it does.

17         Q.   So it is not really stopping that bolt, is

18    it?

19         A.   No.   It's made to allow that bolt to

20    travel up through.

21         Q.   Right.   So there's nothing at the top to

22    stop the bolt, right?

23         A.   No.

24         Q.   Referring to Plaintiff's 5 for

25    identification, why is it that when I turn this bolt,

1  84, clockwise, the bolt just doesn't draw the tension

2  on the spring, 86, and sink itself further into 78?

3           A.   Because of the amount of tension that

4  spring provides.

5           Q.   And coming out, when there is no tension

6  on the spring, why is it that when I turn bolt 84

7  counterclockwise, number 78, the pivot barrel, goes

8  up?  Why is that?

9           A.   Because they are both threaded.

10          Q.   Okay.  So the fact that they are both

11  threaded, number 78 and 82, means that as you turn 84,

12  the threads that are on 82 and the threads that are on

13  78 are interacting?

14          A.   Correct.

15          Q.   And that that's what causes that pivot

16  barrel to ride up and down, is that your testimony?

17          A.   That's correct.

18          Q.   And that's also your explanation as to why

19  it is -- strike that.

20                    (Plaintiff's Exhibit 21, marked for

21                          identification.)

22          Q.   Showing you what's been marked for

23  identification as Plaintiff's Exhibit 21, do you

24  recognize that, Mr. Toffey, to be a photograph of one

25  of your shoulder joints from the rear?

1          A.   I believe it is, yes.

2          Q.   And if you were looking at Plaintiff's 5

3    for identification, is it fair to say that that's a

4    view of the shoulder joint from the left-hand side of

5    the page?

6          A.   Correct.

7          Q.   As if you were looking from the house out;

8    is that right?

9          A.   Yes.

10         Q.   If I could just direct your attention to

11   that nut that's showing up on the adjustment rod.  Do

12   you see that?

13         A.   Yes.

14         Q.   Could you circle that nut for me with the

15   red pen?

16         A.   On the picture?

17         Q.   Yeah.  Was that the jam nut that you were

18   referring to before?

19         A.   Yes, it is.

20         Q.   What is the purpose of this nut?

21         A.   For uplift.

22         Q.   Could you tell me what that is?

23         A.   Well, it would be if a wind came from

24   underneath the awning and tried to push the arms up,

25   without that bolt there, without that jam nut there

1    the bolt could continue traveling in a downward

2    position and come out of its fixed housing from the

3    two plates.

4           Q.   Is that nut that you've circled on

5    Plaintiff's 21 adjustable?

6           A.   No.

7           Q.   And why is it not?

8           A.   It's called a jam nut.  It's made to stay

9    in place to keep this bolt from backing out too far.

10          Q.   To keep number 84 on Plaintiff's 5 from

11   backing out too far, correct?

12          A.   Correct.

13          Q.   How is it -- strike that.  Is it fair to

14   say it's fixed in position there?

15          A.   The bolt?

16          Q.   It can't be tightened or loosened?

17          A.   The jam nut?

18          Q.   The jam nut.

19          A.   It's in a fixed position.

20          Q.   How is that accomplished?

21          A.   It's crushed on.

22          Q.   When is that done?

23          A.   During the time of manufacturing of the

24   shoulder joint in the shop.

25          Q.   It's not done during the time that the

1    pitch is adjusted?

2        A.   Absolutely not.

3        Q.   Looking at Plaintiff's 5 for

4    identification, the jam nut doesn't show up there,

5    does it?

6        A.   No.

7        Q.   And referring back to Plaintiff's 20 for

8    identification, the drawing that was sent with

9    Attorney Hoopes's opinion letter, it's not depicted

10   there either, is it?

11       A.   No, it's not.

12               (Plaintiff's Exhibit 22, marked for

13                identification.)

14       Q.   Showing you what's been marked for

15   identification as Plaintiff's Exhibit 22, do you

16   recognize that to be an affidavit that you filed in

17   this case?

18       A.   Yes.

19       Q.   And turning to page three of the

20   affidavit, paragraph ten that starts that the

21   operation of the system is as follows.  Do you see

22   that?

23       A.   Yes.

24       Q.   Could you just read that paragraph to

25   yourself for a moment, sir?  Have you read it?

1          A.   Yes.

2          Q.   Is that an accurate description of how

3    your awning shoulder works?

4          A.   Yes.

5          Q.   Is it fair to say that that paragraph ten

6    describes how the load shedding operation of the

7    awning works, but it doesn't address how the pitch is

8    adjusted?

9          A.   Correct.

10          Q.   In fact, this affidavit -- strike that.

11    In fact, this affidavit doesn't address the pitch

12    altering function anywhere, does it, sir?

13          A.   I'll have to read it.

14          Q.   Take your time.

15          A.   Could I take a break.

16          Q.   Sure.   Let's go off the record?

17                    (Whereupon, there was a brief

18                    recess.)

19          Q.   Why don't you finish reviewing that and

20    we'll go --

21          A.   Okay.

22                    MR. HOOPES:   May we have the

23    question read back, please?

24                    (Whereupon, the previous question

25                    was read back.)

1          A.   No, it does not.

2          Q.   Other than the Solar Shield product, Mr.

3     Toffey, does Toff Industries use this shoulder joint,

4     the shoulder joint that's depicted on Plaintiff's 5

5     for identification in any other of its products?

6          A.   No, it doesn't.

7                         (Plaintiff's Exhibit 23, marked for

8                          identification.)

9          Q.   In the process of designing the shoulder

10    joint, Mr. Toffey , was there anyone other than

11    yourself involved?

12         A.   No.

13         Q.   And other than the shoulder joint have you

14    ever designed any other awning-related product?

15         A.   It's what I do all day everyday, yeah.

16         Q.   What other awning related products have

17    you designed -- you need to let me finish my question,

18    because this will go a lot easier if you let me do it

19    that way.  What other awning-related products have you

20    designed?

21         A.   Okay, I understand now.  Designed a

22    specific system that's used over and over again like

23    this?

24         Q.   Any component of an awning system.  Other

25    than the shoulder joint that we've been talking about

```
 1          Q.   And did you work with him when you were

 2    customer of Eastern Awning?

 3          A.   Yes.

 4                    (Plaintiff's Exhibit 24, marked for

 5                     identification.)

 6          Q.   Showing you what's been marked for

 7    identification as Plaintiff's 24, do you recognize

 8    this document as an affidavit that you filed in the

 9    case?

10          A.   Yes.

11          Q.   Could you just take a moment and go

12    through that, Mr. Toffey?  Just read it to yourself.

13    If I could refer you back to Exhibit 23 and

14    particularly paragraph 7E, which is on page three,

15    could you review that?  Your supplemental affidavit,

16    24, was filed after Mr. Keough's declaration, right?

17          A.   Yes.

18          Q.   And I gather from your supplemental

19    affidavit that you disagree with Mr. Keough's

20    statement in paragraph 7E?

21          A.   That's correct.

22          Q.   And his statement is that the pitch

23    adjustment rod is secured against vertical movement,

24    correct?

25          A.   That's correct.
```

1          Q.   And we know that your adjustment rod

2    adjusts the pitch of your awning, right?

3          A.   Yes.

4          Q.   So your disagreement is with that aspect

5    of Mr. Keough's statement that says that it's secured

6    against vertical movement, correct?

7          A.   No.

8          Q.   You disagree with that it adjusts the

9    pitch?

10         A.   I don't disagree it adjusts the pitch, but

11   in his statement he is saying my vertical adjustment

12   rod is secured against vertical movement.

13         Q.   Right.  That's what I'm trying to get at.

14   That's where you disagree with Mr. Keough, right?

15         A.   Correct.

16         Q.   We know it adjusts the pitch, right?

17         A.   Yes.

18         Q.   We know that your adjustment rod adjusts

19   the pitch of your awning, right?

20         A.   Correct.

21         Q.   And the point that you have taken issue

22   with is that your pitch adjustment rod, in your view,

23   isn't secured against vertical movement, correct?

24         A.   Correct.

25         Q.   We know that your adjustment rod engages

1    the pivot barrel threadedly, right?

2         A.   Yes.

3         Q.   And that adjusting that adjustment rod

4    selectively raises and lowers the awning arm, right?

5         A.   Correct.

6         Q.   You don't disagree with Mr. Keough's

7    statement in paragraph eight that your spring is a

8    coil spring, do you?

9         A.   No, I don't disagree with that.

10        Q.   It is a coil spring, right, the spring

11   that you use?

12        A.   Right.

13        Q.   Could you tell me why it is you think that

14   your -- strike that.  Could you tell me what the word

15   vertical means to you, Mr. Toffey?

16        A.   Vertical?

17        Q.   Vertical.

18        A.   Up and down.

19        Q.   Is it just up and down?

20        A.   Yes.

21        Q.   Or is it up and down in relation to

22   anything else?  Is it straight up and down?

23        A.   Yes.

24        Q.   Is it your view that your adjustment rod

25   moves straight up and down?

124

```
 1        A.   Yes.
 2        Q.   But it doesn't move straight up and down
 3   when it's adjusting the pitch, does it?
 4        A.   Not unless at the same time the pitch is
 5   being adjusted a wind blows and causes the spring to
 6   collapse.
 7        Q.   While you're adjusting the pitch your
 8   adjustment rod doesn't move up and down, right?
 9        A.   While you are adjusting the pitch
10   typically no.
11        Q.   And that's because we talked about how the
12   pivot barrel rides the bolt up and down, correct --
13        A.   Correct.
14        Q.   -- the bolt stays fixed, correct?
15        A.   Correct.
16             MR. HOOPES:  Can I ask that a
17   question be repeated or that an answer be repeated
18   from two answers, two questions?  Back you said
19   something about a wind storm.  Would you repeat that
20   comment?  I didn't understand what you said.
21        A.   I said something about a wind storm?
22             MR. HOOPES:  I think so.
23             MR. FAHEY:  You want it read back?
24             MR. HOOPES:  I would like the answer
25   read back.
```

1      Q.   And is it only rain that the Eastern

2   Awning system operates to deflect?

3      A.   Yes.

4      Q.   Going back to the counterclaims that you

5   filed on Plaintiff's Exhibit 31, you've also claimed

6   that the patent is invalid.  Do you see that?

7      A.   Where are we now?

8      Q.   We're back to here.

9      A.   This one here?                          —

10      Q.   Yes, last page or page 10, sorry.

11      A.   Okay.

12      Q.   Do you see under counterclaim paragraph

13   number two where it says invalid?

14      A.   Yes.

15      Q.   What's the factual basis for that claim?

16              MR. HOOPES:  Please don't ask that

17   question.  We have already commented in a paper that

18   we're developing that as we go along.

19              MR. FAHEY:  And I need to get the

20   evidence and I am going to ask him the question.

21              MR. HOOPES:  He doesn't know the

22   facts.

23      Q.   If he doesn't know the facts, then he

24   doesn't know the facts, but he needs to answer the

25   question. What's the factual basis for the claim that

```
 1   Mr. Lukos's patent is invalid?

 2                   MR. HOOPES:   If you don't know, say

 3   you don't know.

 4        A.   I don't know.

 5        Q.   Do you know what it means when it says

 6   that the patent is invalid?

 7        A.   I don't -- I am not -- I don't know all

 8   the particulars, no.

 9        Q.   Do you believe that the patent is invalid?

10        A.   Yes.

11        Q.   Why?

12                   MR. PARISOT:   Objection to that

13   question.

14        A.   On the advice of my attorneys.

15        Q.   Okay, fine.   It's based on the advice of

16   your attorneys you believe the patent is invalid; is

17   that fair?

18        A.   I don't -- I guess.   I don't want to say I

19   guess.   That's my answer.

20        Q.   You have no belief as to whether the

21   patent is invalid or valid other than what your

22   attorneys tell you; is that fair?

23        A.   No.

24                   MR. PARISOT:   Objection to that

25   question.   You don't have to answer that here.
```



Our unique Spring Loaded Shoulder Joint Tension System absorbs the shock of wind loads and rain, deflecting pressure from wall brackets, thus preventing damage to your home.

# Nothing Else Even Comes Close!

PLAINTIFF'S
EXHIBIT NO. 5
FOR IDENTIFICATION
DATE: 4/17 RPTR:



JAW

PIVOT POINT

SHOULDER JOINT. H.T.H.

SHOULDER JOINT

SPRING.

PLAINTIFFS
EXHIBIT NO. 20
FOR IDENTIFICATION
DATE: 4/14/05  RPTR: __